**In re: Russell G. MacARTHUR, Debtor.**

**Wegmans Food Markets, Inc., Plaintiffs,**

v.

**Russell G. MacArthur, Defendant.**

No. 99–20834.
AP No. 992179.

United States Bankruptcy Court, W.D. New York.

April 28, 2000.

Louis A. Ryen, Esq., Lacy, Katzen, Ryen & Mittleman, Rochester, for Plaintiffs.

Leonard Relin, Esq., Rochester, for Defendant.

### DECISION & ORDER

JOHN C. NINFO, II, Chief Judge.

### BACKGROUND

On March 25, 1999, Russell G. MacArthur, d/b/a Accent Painting and Power Washing South, Quality Pro Painting, and Rochester Painting and Power Washing, (the "Debtor") filed a petition initiating a Chapter 7 case.

On June 15, 1999, Wegmans Food Markets, Inc. ("Wegmans") commenced an adversary proceeding (the "Adversary Proceeding") to have certain debts determined to be nondischargeable under Section 523. The Complaint in the Adversary Proceeding alleged that: (1) Wegmans was the holder of a judgment against the Debtor (the "Wegmans Judgment") in the amount of $660.57, entered in the Rochester City Court on September 12, 1994, which it obtained after five checks issued by the Debtor to Wegmans for cash or goods were returned either for insufficient funds or because the bank account that the check was drawn on was closed at the time the check was issued; (2) Wegmans was currently the holder of four payroll checks in the aggregate face amount of $1,241.44, issued by the Debtor to either John DeCaro ("DeCaro") or Grant Browne ("Browne") on July 22, 1994 or July 29, 1994 (the "Payroll Checks"); (3) the Payroll Checks were drawn on a bank account that was closed at the time the checks were issued; (4) after the Debtor had is-

sued and delivered the Payroll Checks to DeCaro and Browne, they endorsed and cashed them at Wegmans, which became a holder in due course of the Checks; and (5) the debt represented by the amounts due on Payroll Checks was nondischargeable under Section 523 because the Debtor knew that: (a) the bank account on which the Checks were drawn was closed at the time he issued and delivered them; and (b) DeCaro and Browne would cash their Checks, and DeCaro and Browne, or the party that cashed their Payroll Checks, would ultimately sustain a loss because the Checks would never be honored.

The Debtor interposed an answer (the "Answer") to the Complaint which included an Affirmative Defense that two of the Payroll Checks, those issued on July 29, 1994, one to DeCaro and one to Browne, were forgeries.

At a pretrial conference: (1) the Debtor, by his attorney, advised the Court that he did not oppose the Court entering an order which determined that the amounts due on the Wegmans Judgment were nondischargeable; and (2) the Court advised the attorney for Wegmans that it was uncertain as to how the fact situation which it had presented in the Adversary Proceeding fell within one of the exceptions to discharge set forth in Section 523.

On January 21, 2000, the Court conducted a Trial at which James Weller ("Weller"), the Credit Manager of Wegmans, the Debtor and Browne testified. On the day of the Trial, Wegmans filed a Memorandum of Law in support of its position that the knowing and intentional issuance and delivery of a check on a closed bank account by an individual who had obtained goods or services constituted larceny in New York State, and, therefore, the debt represented by the amounts due on the Payroll Checks were nondischargeable under Section 523(a)(4).[1]

1. Section 523(a)(4) provides that:
 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

 (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

 11 U.S.C. § 523(a)(4) (2000).

At trial, Browne testified that: (1) he had worked for the Debtor as a painting foreman for approximately six months before July 1994, and, as such, was at times asked by the Debtor to distribute payroll checks to the painting crew; (2) he had obtained the Payroll Checks from the Debtor and had distributed them to himself and DeCaro, along with other members of the painting crew, on both July 22, 1994 and July 29, 1994; (3) he obtained the Payroll Checks for distribution directly from the Debtor after he had gone to the Debtor's home to get them; (4) after they received their Payroll Checks, he and De-Caro had gone to Wegmans to cash them; (5) when he obtained the Payroll Checks from the Debtor, he did not see the Debtor sign the checks, nor did he actually look at the signatures on the Checks; and (6) he denied that when he obtained possession of the July 29, 1994 Payroll Checks from the Debtor they were unsigned and he later had someone sign the Debtor's name to them.

At trial, the Debtor testified that: (1) although he could not specifically recollect how the July 22, 1994 Payroll Checks were distributed, he admitted that he did sign the Checks with knowledge that the bank account on which they were drawn was closed; (2) he did not sign the July 29, 1994 Payroll Checks and did not physically hand them to Browne or DeCaro; (3) he wished to pay the amounts due on the July 22, 1994 Payroll Checks; (4) he believed someone may have taken the July 29, 1994 Payroll Checks from his home; and (5) he received a call from Browne indicating that he had possession of the July 29, 1994 Payroll Checks which were unsigned, and that he was going to have the Debtor's girlfriend sign the Debtor's name to them.

At trial, the Debtor and the attorneys for the Debtor and Wegmans stipulated that the Court could enter an order which determined that the amounts due on the July 22, 1994 Payroll Checks were nondischargeable.

## DISCUSSION

### I. *Findings of Fact*

After hearing the conflicting testimony of Browne and the Debtor, and carefully observing the demeanor and credibility of both Browne and the Debtor, I find that Browne's testimony was more credible. I further find that: (1) although the Debtor may not have signed the July 29, 1994 Payroll Checks, he caused them to be signed or otherwise authorized his signature to be placed on the Checks; and (2) the Debtor distributed or authorized the distribution of the Payroll Checks to De-Caro and Browne with knowledge that the bank account on which the Payroll Checks were drawn had been closed in June 1994.

### II. *Potential Section 523 Causes of Action*

 The exceptions to discharge set forth in Section 523 are to be construed strictly against a creditor requesting that a debt be determined to be nondischargeable. *See In re Peters,* 133 B.R. 291 (S.D.N.Y.1991), *aff'd* 964 F.2d 166 (2d Cir. 1992). The intention of Congress in setting forth the exceptions in Section 523(a) was to insure that a debtor received a fresh start but not a head start.

In its Memorandum of Law, Wegmans' only assertion was that the debts it held against the Debtor, as the holder in due course of the Payroll Checks, were nondischargeable because the Debtor had committed larceny within the meaning and intent of Section 523(a)(4). The Court has taken that as an acknowledgment by Wegmans that it does not have or wish to pursue a cause of action under either Section 523(a)(2)(A) or Section 523(a)(6).

 Section 523(a)(2) excepts from discharge any debt for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, a false representation or actual fraud. In this case, even if the Debtor had drawn the July 29, 1994 Payroll Checks on a bank account which he

knew was closed, it does not appear that he obtained any money, property or services from either DeCaro, Browne or Wegmans by issuing and delivering the Payroll Checks. DeCaro and Browne had already performed their services for the Debtor by the time they received their Payroll Checks, so they were not induced to perform those services in specific reliance on the July 29, 1994 Payroll Checks, but only on an expectation and promise of payment pursuant to their oral or written employment contract.[2] As to Wegmans, the Debtor never obtained any money, property or services from Wegmans when DeCaro and Brown cashed their Payroll Checks.

■ Recently the United States Supreme Court in its decision in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) made it clear that to prevail on a cause of action for willful and malicious injury under Section 523(a)(6), the debtor must have intended the actual injury caused. In this case, the Debtor could never have known for certain that Wegmans or any other third party would actually cash or honor the Payroll Checks, and not be reimbursed by DeCaro or Browne when their Check was dishonored by the bank on which it was drawn because the account had been previously closed. Any party honoring or cashing one of the Payroll Checks would have acted in reliance on the warranty of the payee, DeCaro or Browne, that the Check was good or they would make it good.

### III *Section 523(a)(4)*

■ Larceny, for purposes of Section 523(a)(4), is defined by reference to Federal Common Law, and it requires that the creditor show that the debtor wrongfully took property from it with fraudulent intent. *See In re Marcou,* 209 B.R. 287, 293 (Bankr.E.D.N.Y.1997), and the cases cited therein.

**2.** If DeCaro or Browne commenced an Adversary Proceeding against the Debtor and they could prove that he had intended all along to obtain their services without paying for them

■ From the facts and circumstances presented in this Adversary Proceeding, it is clear that the Debtor never wrongfully took, obtained or withheld any property from Wegmans, so there was no Federal Common Law larceny.

In its Memorandum of Law, Wegmans cited to the Court Section 190.05 of the New York State Penal Law which provides that a person is guilty of issuing a bad check when:

1. (a) As a drawer or representative drawer, he utters a check knowing that he or his principal, as the case may be, does not then have sufficient funds with the drawee to cover it, and (b) he intends or believes at the time of utterance that payment will be refused by the drawee upon presentation, and (c) payment is refused by the drawee upon presentation; or

2. (a) He passes a check knowing that the drawer thereof does not then have sufficient funds with the drawee to cover it, and (b) he intends or believes at the time the check is passed that payment will be refused by the drawee upon presentation, and (c) payment is refused by the drawee upon presentation.

In addition, Wegmans cited to the Court Section 155.05 of the New York State Penal Law which provides in part that:

2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: . . .(c) By committing the crime of issuing a bad check, as defined in Section 190.05[.]

Even if the Court were to look to New York rather than Federal Common Law in analyzing whether the debt in question should be excepted from discharge because

because he always intended to issue them a payroll check drawn on a closed bank account, they might be able to meet the required burden under Section 523(a)(2)(A).

it was for larceny, Wegmans has not met its burden.

Based upon the Court's findings, as set forth above, the Debtor issued "bad checks" when he signed the July 29, 1994 Payroll Checks, or caused them to be signed or authorized his signature to be placed on them, and delivered or authorized their delivery to DeCaro and Browne, knowing that they were drawn on a closed bank account.

■ A quick reading of the definition of larceny as set forth in the New York State Penal Law, which states that it includes committing the crime of issuing a bad check, makes it appear that the debt due to Wegmans, as a holder in due course of the amounts due on the July 29, 1994 Payroll Checks, is nondischargeable by reason of larceny because the issuance of a bad check in all circumstances constitutes larceny.[3] However, the case law in New York is clear that the issuance of a bad check is only larceny under Section 155.05(2)(c) if the check was issued in connection with the taking, obtaining or withholding of property. *See People v.* Campobello, 154 A.D.2d 911, 546 N.Y.S.2d 62 (App.Div.1989) (issuance of a "bad check" to repay a loan), and *People v. Gasbara,* 95 A.D.2d 333, 468 N.Y.S.2d 54 (App.Div. 1983) (issuance of a "bad check" to repay a real estate deposit).

■ The Debtor never obtained any property or services of any kind from Wegmans, and, as discussed above, he did not obtain property or services from DeCaro and Browne by reason of his issuance of the Payroll Checks. The services which the Debtor obtained from DeCaro and Browne had already been performed by the time he issued the Payroll Checks. Although the Debtor might have been guilty of the crime of issuing a bad check under New York Law, it does not appear to this Court that he could be found guilty of larceny as set forth in Section 155.05(2)(c).

For these reasons, although the Court does not condone the Debtor's actions in any way, it cannot find the debt due to Wegmans for the amounts due on the July 29, 1994 Payroll Checks to be nondischargeable. Not every wrongful or even criminal act by a debtor which results in an indebtedness is nondischargeable, only those specifically excepted from discharge by Congress in Section 523.

## *CONCLUSION*

The debt due to Wegmans as the holder in due course of the July 29, 1994 Payroll Checks is determined by this Court to have been discharged by the Debtor's discharge entered on July 2, 1999. The debts owed to Wegmans, represented by the Wegmans Judgment and the July 22, 1994 Payroll Checks, are determined to be nondischargeable, due to the agreement of nondischargeability by the Debtor.

**IT IS SO ORDERED.**

---

**3.** Absent a bankruptcy, whether a drawer of a check is charged with issuing a bad check or larceny is of no practical consequence. In either case, if convicted, it is likely that there will be a restitution award, and ultimately the drawer will pay the amounts due.